## OYER AND TERMINER.

### MILLEDGVILLE, (GEO.) OCTOBER, 1823.

| | |
|---|---|
| *The State* vs. *John M. Williams.* | MURDER. |

Messrs. *King, Rockwell, Cuthbert,* and *Sparks,* Counsel for the state.

Messrs. *Strong, Holt,* and *Saffold,* Counsel for the Prisoner.

MILLEDGE-
VILLE,
October, 1823.

The State
v.
Williams.

This was an indictment in Jones Superior Court, at the October Term, 1823, against the prisoner, John M. Williams, for the murder of his wife; and such was the extraordinary excitement produced on the public mind by the unparalleled cruelty and depravity which marked the features of this transaction, that it was not until three full panels of forty eight jurors each, had been successively summoned and tendered to the prisoner, that a *Jury, omni exceptionis majoris,* were sworn.

It appeared, that on the 14th day of May last, the brother in law of the prisoner, and his wife, (who was the sister of the prisoner's wife) were on a visit at the prisoner's house, six or seven miles from Clinton. A fishing excursion was proposed and agreed to, upon which the prisoner and his brother in law were absent from the house until about six o'clock in the evening, at which time they returned. Dinner being immediately prepared for them, they sat down apparently in fine humour. While sitting at the table, an infant child of the prisoner, then only nine days old, cried, and Mrs. Williams, its mother, rose and took it up; when the prisoner inquired, "Mary, whose child is that?" She made him no answer. He repeated the inquiry, and she answered, smiling, "Mr. Williams, you know whose it is." The prisoner immediately became enraged, and burst forth into a strain of bitter and indelicate abuse. Upon this the brother in law interposed, and threatened to chastise him for his conduct; but in consequence of the entreaties of the prisoner's wife, he desisted. Shortly after this scene, the brother in law and his wife departed for their residence in Clinton, the prisoner having apparently become calm, and acknowledged his error: but upon his sister in law taking leave of him, and offering him her

hand, he observed, she need not shake hands with him, but
"*bid her sister farewell.*" These words, though ominous,
were not at that time particularly regarded by them,
and they departed. About the distance of a mile from the
prisoner's house, they met a Mr. Gibson, and being ap-
prehensive that the prisoner's anger might return after
they left the house, and that he might, in the unprotected
state of his wife, whip her, or do her some other injury,
they requested him (Mr. Gibson) to ride on as fast as
possible to the prisoner's house, and to quiet any angry
feelings that might remain, commence a conversation with
him on the subject of his election—the prisoner having
shortly before announced himself as a candidate for a jus-
tice of the peace.—When Gibson arrived within one fourth
of a mile of the prisoner's house, he heard the shrieks of
a female apparently in great distress. He hastened to the
spot, and then a spectacle was presented to his view that
for misery and horror beggars all description. About
twenty or thirty yards from the house he found the priso-
ner's wife stretched upon the ground, her head almost sev-
ered from her body, there remaining not more than one and
a half inches of skin on the back part of her neck, her
hair thrown back, and clotted with gore, and in other res-
pects most dreadfully mangled, and the prisoner standing
within five or six feet of her with a razor in his hand, at-
tempting to cut his own throat. Mr. Gibson, on his arrival
found that a Mr. Bazemore and a Mrs. Roquemore had
reached there before him. Mrs. Roquemore stated in her
testimony, that she was returning home from Mr. Baze-
more's, who lived within less than one fourth of a mile of
the prisoner, with an intention of calling on Mrs. Williams,
(the prisoner's wife,) when she was informed that the pris-

oner was killing his wife. She hurried on as quick as possible, and went immediately into the prisoner's house, where she found no person but the infant child, screaming most piteously on the bed. She took it up, and found laying on the floor a lady's cap with the strings cut, and a cap torn in two, and many marks of blood in the room. She heard a noise in the field, and went to the spot from whence it proceeded, and found the prisoner and his wife in the situation described by Gibson. Mr. Bazemore testified, that he had on that day been in company with the prisoner and his brother in law at the river in their fishing excursion. They left him, and in the evening he passed by the house of the prisoner on his way home. When passing by, he supposed that both the prisoner and his brother in law were at the house. He went home, a distance of something less than one fourth of a mile from the prisoner's house, and there found Mrs. Roquemore in the act of setting out home. He immediately sat down to dinner, and before he had finished eating he was informed that the prisoner was killing his wife. He sprang from the table, and ran over to the house of the prisoner, and when he reached the yard gate, he saw Mrs. Roquemore running out greatly distressed, with the prisoner's infant in her arms. At some distance off he saw the prisoner standing with a razor in his right hand, attempting to cut his own throat, and with his left hand beckoning to him (the witness) as if he wished him to approach.— He went immediately to him, and found Mrs. Williams as described by Gibson, with the blood yet flowing from the wound.—He exclaimed, " look Williams ! see what you have done !" upon which the prisoner pointed to the corpse of his wife, and groaned hideously. Bazemore then wrested the razor from him, and Gibson, who ar-

rived at the same moment, assisted him in carrying the prisoner to the house. In the room of the house, behind a trunk in which the prisoner kept his razor, was found a two bladed pocket knife, open and bloody, and upon the lid of the trunk, the print of a man's bloody hand. The knife was proved to be the prisoner's.

From the testimony of other witnesses, and particularly the ladies who shrouded the deceased, it appeared that many other severe wounds had been inflicted ; one on the back of the head which reduced the part to a jelly, as if with a stick, a large perforation in the temple, and one or two in her breasts, apparently produced by stabs with a pocket knife.

It appeared from the testimony that the prisoner and his wife had been married between five and six years; that she was the mother of four children; that she was young, lovely, amiable, and affectionate, and at the time of her marriage possessed a fortune sufficient to insure, under discreet management, a handsome competence; that he was gay, likely, and possessed a good understanding; but that under all these circumstances their matrimonial felicity was very incomplete. From a strange perversity of disposition on his part, he had frequently treated her most cruelly. She had several times exhibited marks of the most inhuman violence; but such was the kindness of her disposition, and the meek forbearance of her nature, upon the smallest expression of his regret for his cruel and unmanly conduct, he was always sure of her forgiveness, and a quick return of her warmest affection. When his injurious conduct was confined to ungenerous and abusive upbraidings, she never murmured or resisted ;

MILLEDGE-
VILLE,
October, 1823.

The State
v.
Williams.

and when his headlike disposition led him to extend it to blows, she implored his mercy.

It was attempted, on the part of the counsel for the prisoner, to prove insanity: but they totally failed, all their witnesses proving that he was a man of strong and vigorous intellect. They then rested the defence, and in their arguments contended for an acquittal upon two grounds: first, the danger of convicting upon circumstantial evidence. Under this head they ingeniously tried to convince the jury that a possibility existed of the deceased having committed self murder. 2dly, They contended and urged, with a zeal deserving a better cause, that if the prisoner did commit the murder, the circumstances attending it were so horrible in themselves as to prove conclusively that he must have been in a state of mental derangement; that no human being possessing the full use of his reason could conceive, much less execute, an act of such dreadful atrocity. At 11 o'clock at night, the trial having occupied the whole of the two preceding days, the argument closed, and the judge having, in an impartial and impressive manner, instructed the jury in all the points of law which could be possibly involved in the case, they retired to their room, and in five minutes returned into court, and amidst the apparent stillness of death, pronounced a verdict of GUILTY.